## In re HOME DISCOUNT CO.

### In re ROSE.

(District Court, N. D. Alabama, S. D. July 3, 1906.)

1. BANKRUPTCY—ORDERS OF REFEREE—REVIEW.

A party to an order made by a referee in bankruptcy after hearing on the merits cannot have it reviewed, as provided by Bankr. Act July 1, 1898, c. 541, § 38, 30 Stat. 555 [U. S. Comp. St. 1901, p. 3435], unless he pursues the mode prescribed by General Orders No. 27 (89 Fed xi; 32 C. C. A. xxvii).

2. SAME—DISOBEDIENCE.

A party to an order made by a referee in bankruptcy cannot ignore the order until the referee certifies his disobedience to the judge, as authorized by Bankr. Act July 1, 1898, c. 541, § 41, 30 Stat. 556 [U. S. Comp. St. 1901, p. 3437], and then, on the summary hearing for which the statute provides, set up in defense matters contested before the referee, unless they show he was without jurisdiction to make the order.

3. CONSTITUTIONAL LAW — POLICE POWER — REGULATION OF LOANS — CLASS LEGISLATION.

Act Ala. March 9, 1901 (Acts 1900-01, p. 2685), regulating the business of money brokers, and providing that all persons engaged in loaning money on security of bills of sale, etc., shall express in the instrument securing such loan the rate of interest, the date of the loan, the fact that the instrument is taken for a loan of money, a minute description of the property, and within five days shall file the instrument for record in the office of the probate judge, and that contracts for the loan of money made in violation of the act shall be void, was a valid exercise of the state's police power, and was not unconstitutional for inequality, although its provisions do not "apply to the business of banking and loans, when the amount exceeds seventy-five dollars."

4. BANKRUPTCY—FUTURE WAGES—ASSIGNMENT—DISCHARGE.

A bankrupt's right to earn wages in the future and dispose of the fruits of his labor is not "property," as that term is used in Bankr. Act, July 1, 1898, c. 541, § 70, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451], vesting all the bankrupt's property not exempt in his trustee, etc.; and hence the bankrupt's discharge operated to avoid an assignment of future wages given to secure a provable debt earned after the filing of his petition.

5. SAME—ASSIGNMENT—WITHDRAWAL—ORDER OF REFEREE.

Where a creditor of a bankrupt took an assignment of future wages to secure a loan, which was contrary to public policy, and prior to the debtor's adjudication in bankruptcy, the lender took no steps to reduce the wages to its constructive possession, and did not notify the employer until after the intervention of bankruptcy proceedings, when the assignment was filed with the employer, the steps taken by the lender subsequent to adjudication were invasive of a possession which was already in the bankruptcy court, and hence the referee had power to summarily compel the lender to restore the status quo with reference to the bankrupt's wages by withdrawing the notice of assignment.

6. SAME—INSTITUTION OF PROCEEDINGS—PARTIES.

Since the wages earned by the bankrupt after the filing of a petition, in the event of his discharge, passed to the bankrupt in his own right, the referee's order was not erroneous because the proceeding was begun at the instance of the bankrupt.

7. SAME—FALSE PRETENSES.

Where a statute provides that all contracts for the loan of money made in violation of its provisions shall be invalid and void, and the loan to the bankrupt is made in violation of its provisions, the fact that the bankrupt obtained the loan by false pretense does not create any debt which the court can recognize, and does not prevent the referee's ordering the lender to withdraw notice of the assignment of wages filed by him with the bankrupt's employer to tie up the bankrupt's wages after adjudication and pending discharge.

8. SAME—REVIEW.

In the absence of statutes or rules of court, a petition to review or revise an order of a referee in bankruptcy does not of itself operate as a supersedeas, and whether or not it shall have that effect rests in the discretion of the reviewing or reviewed authority in the particular case.

[Ed. Note.—Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

9. SAME—TRIAL DE NOVO.

A petition for review of a referee's order in bankruptcy proceedings does not contemplate a trial de novo.

10. SAME—SECURITY FOR COSTS.

There is nothing in the bankruptcy statute, or the rules prescribed by the Supreme Court to carry it into effect, which forbids the District Court from providing by rule that the filing of a petition for review shall not operate as a supersedeas of the order made by the referee, unless bond be given to indemnify the opposite party in such sum as may be prescribed by the referee or by the judge, or from requiring the petitioner to give security for the costs of the review. A party certified for contempt for refusing to obey an order, who has not superseded it and given security for the costs of the petition for review, cannot justify his disobedience, if the order is not absolutely void, on the ground that it is no offense to disobey the order until after the court has confirmed it.

11. SAME—CONTEMPT—VIOLATION OF REFEREE'S ORDER—ADVICE OF COUNSEL.

Where, after a referee in bankruptcy had ordered a creditor of the bankrupt to withdraw an assignment of wages filed with the bankrupt's employer, the creditor intended to violate the order and continued to do so until the bankrupt was compelled to pay the claim as his only means of obtaining sustenance from future wages, advice of counsel was no defense to a proceeding against the creditor for contempt.

12. SAME—LIABILITY.

Where, after a referee in bankruptcy had ordered a creditor to withdraw an assignment of wages which had been filed with the bankrupt's employer, the creditor took no steps either to obey or supersede it, but

the creditor's manager for 'three weeks, in the face of the referee's order, continued to tie up the bankrupt's wages until he was compelled to pay the claim, the creditor was subject to punishment for contempt.

## In Bankruptcy.

On March 2, 1906, Referee Birch, at Birmingham, certified that Mrs. J. Huff, the manager of the Home Discount Company, a money broker, stood in contempt for refusing to obey an order made by the referee on February 15, 1906, directing her to withdraw an assignment of the wages of one A. J. Rose, a bankrupt, adjudged on the 13th of February, 1906, which she filed the next day after hearing of the adjudication, with his employer, the Alabama Great Southern Railroad Company. The certificate stated, among· other things, "that the assignment was served on his present employer for the purpose of harassing and annoying the bankrupt, and forcing him by unlawful methods to pay an outlawed debt, with the hope that, unless said assignment was withdrawn, the bankrupt would lose his position under the rules and regulations of the railroad company by whom he was employed." It also certifies "all pleadings and papers filed in this case," and that a rule was issued by the referee to Mrs. Huff, who appeared, and on the hearing, her answer being adjudged insufficient, she was directed to withdraw the assignment; but neither the rule, nor the pleadings, nor the order to Mrs. Huff is contained in the papers so certified. The pleadings and papers certified show that on the 15th of February, 1906, the referee issued a rule to the Home Discount Company to show cause why it should not dismiss the assignment proceeding, and propound its claim in the court of bankruptcy; that it appeared specially, protesting against the jurisdiction and not waiving its objection, filed an answer, which was sworn to by Mrs. Huff, setting up that the bankrupt, for a present valuable consideration, had transferred the money in controversy; that the assignment was accepted in good faith, and not in fraud or in contemplation of the bankrupt act; that the property therein assigned was within the exemption limits of the state of Alabama, in which state the bankrupt resides, and in which the contract was to operate and take effect; "that the bankrupt, in order to obtain the money paid for the assignment, falsely represented that he was not insolvent, and that his indebtedness amounted to nothing; that the representation was made in writing and relied on by the company, and by means of it the bankrupt obtained the consideration for the wages, and is therefore not entitled to discharge. The record further shows that the bankrupt entered a general and special denial, and set up specifically that the assignment was void, under a local statute, and, further, that Mrs. Huff, the manager of the Home Discount Company, and the bankrupt, both testified on the hearing before the referee. The referee found that the assignment was void, and on February 15, 1906, made the following order: "February 14, 1906, being the day set for the hearing on the petition of above-named bankrupt, filed on the 12th day of February, 1906, and it appearing that notice has been duly given as required by the order of the court thereon, and answer of Home Discount Company having been deemed insufficient, it is ordered that the Home Discount Company do immediately cause to be withdrawn notice of the assignment and the assignment proceeding pending thereon upon the claim against the said bankrupt, and the Alabama Great Southern Railroad Company discharged, and that he propound his claim, if any he has, against said bankrupt in no other than in this court." On March 3, 1906, the attention of the District Judge, who was then holding court in the Middle district at Montgomery, was called to the failure of Mrs. Huff to obey the order directed to her, and he ordered the issue of a rule to her to show cause, etc. The matter came on further to be heard at the adjourned March term at Birmingham in June, 1906.

Some of the original papers in the proceedings before the referee as to Mrs. Huff are missing from the files, but a copy of the order to her is set forth in her answer to the rule nisi from the District Court as Exhibit C, which shows that on the proceeding before the referee, the answer of.

the Home Discount Company having been deemed insufficient, it is "ordered that Mrs. J. Huff, agent of the Home Discount Company, do immediately cause to be withdrawn notice of the assignment and the assignment proceedings pending thereon upon the claim against said bankrupt, and the Alabama Great Southern Railroad Company discharged, and that he propound his claim, if any he has, against the bankrupt in no other than this court." Upon the coming in of Mrs. Huff's answer to the rule from the District Court, and in view of the statements that the cause was submitted for final order on the pleadings, without oral testimony, or "any other evidence;" that she was only an employé, and had no authority to withdraw notice of the assignment without instructions from the attorney of the company, who advised her not to obey until petition for review had been passed upon, the District Court, then sitting at Birmingham, ordered the issue of a rule to the Home Discount Company to show cause why it should not be punished for its disobedience to the order of the referee directed to it on the 15th of February, 1906. The company appeared specially for the purpose of the motion, and moved to strike from the files the petition on which the rule was issued, and to discharge the rule, on the ground that the court was without jurisdiction in a summary proceeding to determine the rights of the respondent, an adverse possessor, to the money in controversy. It insisted upon the defenses made in its answer before the referee, as to the validity of the assignment, etc., and set up a false pretense by the bankrupt in obtaining the loan, and averred that he was not entitled to a discharge. It also alleged that within five days after the making of the referee's order it filed a petition for review with the referee; that the filing of this petition was a matter of right, and operated as a supersedeas and transfer of the matter appealed from to the District Court; that the proceeding was instituted by the bankrupt, who was not interested, and could not assail the transfer of wages. It stated as a further defense that on the 10th of April, 1906, the bankrupt himself and counsel proposed to have the proceedings dismissed and respondent discharged, without cost or damage to it, upon the payment by the bankrupt of the actual amount obtained, together with a reasonable attorney's fee, which the company accepted in good faith, etc., and insisted, the bankrupt being the only party complaining, that the matter ought to be treated as settled. The company also made a separate motion to dismiss the proceedings on account of the settlement, which motion was joined in by Messrs. Lamkin & Watts, attorneys, who it would seem were specially employed to negotiate the settlement for the bankrupt, and did so. These gentlemen did not appear before the referee, or before the District Court; the bankrupt being represented on these occasions by his attorneys, Messrs. Truss & Howlett. It being denied, when the matter came on for hearing, that any petition for review had been filed in this case, and asserted that the settlement made by the bankrupt in April was not voluntary, the District Court had a subpœna issue to Mrs. Huff to testify in the case. The marshal reported that she was too ill to attend court. Rose, the bankrupt, a locomotive engineer, was absent from the district on one of his runs. Other witnesses were heard, and proved that the paper in the file certified, giving the substance of the testimony of Mrs. Huff and the bankrupt before the referee, was substantially correct. Both of them testified before the referee that the assignment was taken to secure a loan for $40.00, made in December, 1905, the company taking a paper for that amount, and loaning him $36.00, and that this loan was renewed in January. The bankrupt's testimony, on that occasion, was that the words "February and March" were not in the instrument when he signed it, and that nothing was said about them, nor was he asked how much he owed, and that the word "nothing" was not in the contract when he signed it. Mrs. Huff on the same occasion testified that the words "February and March" were put in the assignment when the loan was renewed, with the bankrupt's consent, and that the word "nothing" was in the contract when he signed it. The body of the instrument was a printed paper. The only writing was the figures "$40.00," the name of the railroad company to whom it was addressed and in whose service the wages were to be

earned, the words "January, February, and March," the word "nothing," the signature of the bankrupt, A. J. Rose, and the signature of the witness, Mrs. J. Huff. The assignment when filled in, read as follows:

"$40.00                                 Birmingham, Ala., Dec. 14, 1905.

To the A. G. S. R. R. Company, Birmingham, Alabama: For value received, the receipt whereof is hereby acknowledged, I, the undersigned do hereby transfer, sell, assign and set over unto Home Discount Company, all wages, salary or money now due or to become due to me from the said A. G. S. R. R. Company, during the months of Jan. Feb. March, 1906. In order to obtain the consideration paid for the above wages, salary or money, receipt whereof is hereinabove acknowledged, I state that I am employed, regularly, by the firm, individual or corporation to whom this instrument is addressed or directed, and that they. he, or it are, or is, indebted to me in an amount in excess of the consideration as recited for the months set forth above, and that there are no judgments, judgment liens, garnishments, orders, attachment liens, assignments or liens or claims of any other kind or character upon or against said wages, salary or money on me in favor of any person, firm or corporation; that I am solvent; that my total indebtedness does not exceed the sum of nothing, which I have ample property to pay off and satisfy in full, outside of any exemption rights which I have under the laws of the state of Alabama. For value received, I, the said undersigned, do hereby irrevocably constitute, authorize and empower G. E. Horton, or any other agent for said Discount Company, my true and lawful attorney in fact, to execute or sign any other transfer, or assignment or different instrument necessary or proper, or which may be required or deemed necessary by him, for the purpose of collecting said money, or any part thereof, including receipts, vouchers, drafts, and pay rolls, etc., in my name, or otherwise, at his pleasure. If for any reason the said Home Discount Company should fail to collect or receive all of said wages, money or salary, set forth above, for the said consideration, I the said undersigned, do hereby further transfer, sell, assign and set over unto the Home Discount Company all other wages, salary or money which may hereafter accrue to me from the same person, firm or corporation to whom this instrument is directed, or from any other person, firm or corporation for a number of months equal to the number set forth above, to be selected by the said Home Discount Company, or any authorized agent, and I hereby constitute and appoint any agent of said Home Discount Company my true and lawful attorney in fact, in my name or otherwise, to execute such other or further instruments necessary or which he may see fit to execute for the purpose of collecting all or any part of said money, or wages, including signing checks, pay rolls, and indorsing checks in my name. I hereby agree to act as the agent of the said Home Discount Company for the collection of the said money or wages, and account to it for every cent of the same immediately upon the collection thereof, and hereby acknowledge the constitution and appointment of myself as such agent or bailee of said Discount Company for such purpose. In the event of the employment of an attorney for any purpose in relation to this instrument or the money herein assigned, I hereby agree to be taxed with his fee, and waive the right of exemption as to any judgment recovered on account of any matter connected herewith, or growing out of same.

"Witness: Mrs. J. Huff.                           A. J. Rose."

Repeated efforts were made by the bankrupt and Truss & Howlett, his attorneys, after the referee made his order, to induce the respondent to pay the money into court, or to the bankrupt, and they procured the rule nisi from the district judge in March to Mrs. Huff. Howlett testified that Mrs. Huff, the manager of the company, told him that "her attorneys had advised her to hold onto the money, and she intended to hold it, and there is no use for you to come around here any more." Rose was a locomotive engineer in the service of the Alabama Great Southern Railroad Company. In February and March he earned $184.65 wages, and the amount stated to be due him for January in Rose's petition was $72. When the assignment was filed,

like assignments of wages in favor of the Southern Trust Company for $15 and W. C. McCarty for $28.75 were filed with the railroad company. It was shown that efforts were made, by the bankrupt and his attorneys, at different times, shortly after the referee's order, to get the railroad company to hold back enough of the money involved in these several assignments to pay the claims under them, and turn over the balance to the bankrupt. The railroad company was unwilling to do this unless the bankrupt gave bond to hold the railroad company harmless, which the bankrupt was unable to do. About that time, or shortly before, the referee had also issued a rule to the railroad company to show cause why it should not pay the wages into court. The garnishment clerk of the railroad company testified as to this, and that he "was holding the money on the garnishment." The bankrupt's wages for the months of January, February, and March were held by the railroad company until April 10, 1906. An affidavit of the bankrupt was filed, which, after stating that he paid $117.25 in settlement of the claims of the Home Discount Company, W. C. McCarty, and the Southern Trust Company, which loans originally amounted to $79.75, all of which were then in the hands of W. T. Ward, who was the attorney for the Home Discount Company, stated "that he was forced to enter into the settlement because of the fact that the said parties had failed and refused to obey the orders of the referee made in the case of A. J. Rose, bankrupt; that he was without the necessaries of life; that his family was in actual need; and that his supply men were cutting him off from further credit."

When the referee's order was made in this case, like orders were directed to the Southern Trust Company and W. C. McCarty as to assignments by Rose in their favor of wages to be earned with the same railroad company. In those cases petitions for review were filed, and the orders of the referee were passed on the pleadings. The attorney of the Home Discount Company testified that a petition for review was filed in this case. The referee's docket shows no such filing, and no such paper was filed in the clerk's office. In view of these facts, and the statement in the alleged petition for review that the order was made without "the hearing of any testimony," although it is undisputed that on the hearing before the referee Mrs. Huff did testify for the company and the bankrupt for himself, and the company was then represented by the same attorney who now represents it here, it is clear that the attorney has confused this case with the other cases, in which he was of counsel, in which petitions were filed, and which went off on the pleadings, and in which witnesses were not heard. The referee testified that he had never seen any such paper. The attorney for the company also testified that on the making of the settlement with the bankrupt the latter "was represented by Griffin Lamkin, a schoolmate and personal friend of his; that he did not wish to make the settlement, as there were certain questions he proposed to have reviewed by the District Court; that his friend insisted on a settlement, to which he finally consented, the bankrupt agreeing to pay the amount he obtained, with costs and a reasonable attorney's fee, this being $10.00 in each of the three cases, or $30.00 in all; that he did not consider this a reasonable fee, but consented to it, for the reasons already stated." It was not claimed that the costs of the petition for review were either paid or secured, or that any application for supersedeas was made to the referee or to the judge.

Truss & Howlett, for the rule.
Ward & Ward, opposed.

JONES, District Judge. A party to an order made by the referee after hearing on the merits cannot have a review of it, under section 38 of the bankruptcy statute (Act July 1, 1898, c. 541, 50 Stat. 555 [U. S. Comp. St. 1901, p. 3435]), unless he pursues the mode prescribed by General Orders No. 27, 89 Fed. xi, 32 C. C. A. xxvii. He cannot ignore the order until the referee, under section 41 (30 Stat. 556

[U. S. Comp. St. 1901, p. 3437]), certifies his disobedience to the judge, and then bring forward again, in his defense, matter contested before the referee prior to the making of the order, provided the order itself be not void. "The method of correcting error is by appeal, and not by disobedience." People v. Sturtevant, 9 N. Y. 263, 59 Am. Dec. 536; Passamore Williamson's Case, 26 Pa. 9, 67 Am. Dec. 374. The hearing "in a summary manner," for which the latter section provides, has no reference to errors intervening in the proceedings which led up to the order, and cannot be converted into an appellate proceeding to determine their correctness. The court heard evidence as to the contentions of the parties because matters occurring subsequently to the making of the order, were set up in defense or abatement of the contempt proceedings. As respondent insists that the matters upon which it seeks to go behind the referee's order render it void, and the same questions are involved in other cases now pending, the court will consider the correctness, as well as the validity, of the order made in respondent's case.

1. The assignment of wages was taken in December, 1905, by a money lender in Jefferson county, to secure a loan under $75 in amount. On March 9, 1901, the General Assembly of Alabama passed "An act regulating the business of money brokers and persons who loan money for themselves or others on bills of sale, notes or mortgages or personal property or other personal security in Jefferson, Morgan, Walker and Etowah counties." Approved March 9, 1901; Acts 1900–01, p. 2685. It provides, among other things, "that all persons engaged in the business of money brokers or loaning money or taking security therefore by bills of sale, mortgages on or conveyances or liens of any kind on personal property of [or], personal effects or other personal security," in the counties named, "shall when such loan is made, express in the instrument securing such loan, the rate of interest at which said loan is made, the date of said loan, the fact that the instrument is taken for a loan of money, a minute description of said property securing the loan, and if household goods from whom purchased, the date when said loan is due, and shall within five days thereof file said instrument for record in the office of the probate judge of the county in which the property or instrument securing said loan is situated." etc. In one section, the act provides "that all contracts for the loan of money made in violation of this act, shall be invalid," and in another "that any contract made for the loan of money in violation of this act shall be void." Another section provides that the moneylender, if a nonresident, "shall give bond conditioned to pay all damages that any person may sustain by reason of the enforcement, or the attempt to enforce any security taken for a loan in violation of this act." Another section provides, if the claim is put in the hands of an attorney for collection, the attorney's fee "shall not exceed ten per cent. of the original loan." The fifth section provides that "nothing in this act shall apply to the business of banking and loans, when the amount exceeds seventy-five dollars." The exact scope of this last section is not clear. Does this proviso take loans in the business of banking, no matter how small the amount, wholly

without the operation of the statute, and restrict it to loans made by other persons under $75; or does it intend merely that loans over $75 made in that business, as well as all other loans over that amount, no matter by whom made, are excepted from the operation of the act? It is insisted that the first is the true construction, and that the exception of the business of banking renders the statute unconstitutional. Assuming, without deciding, that loans by banks and bankers, though under $75 are excepted, and that all loans by others under $75 are left within the grasp of the statute, we will consider the matter in that aspect.

Perfection is no more to be exacted in legislation than in other human work. The motives and interests animating men, and the economic, industrial, social, and moral conditions which affect the welfare of society, are almost infinite in number and character, so that it is impossible, in practice, without creating evil and injustice, to apply the same unbending rule to all of these varying situations in dealing with concrete human affairs. Legislative power, therefore, must frequently indulge in marked differences between persons and things in its attempts to remedy particular evils. Neither the state nor the federal Constitution exacts perfect equality in the apportionment of the burdens which the state finds it necessary to impose upon men to advance the public weal. Mere want of equality in the burdens imposed, or varying rules for the conduct of different persons, even in relation to the same general subject-matter, will not avail to overthrow a statute, if the differences it makes are not merely arbitrary. If its distinctions are based upon some just reason, and it does not attempt, under the guise of regulating an evil, to deprive of liberty or property without due process, or unjustly to confer special or exclusive privileges upon one class at the expense of others, or to put burdens and penalties upon persons beyond the extent to which their conduct and relations to an evil fairly subject them, in view of the principle upon which the regulations are rested, the statute is not objectionable on constitutional grounds.

The mischief which called forth the statute is well known. It arose in the contracting and collection of small loans in dealings with necessitous borrowers and small wage-earners, who as a rule had no security except the pledge or assignment of wages to be earned and household goods. The borrowers agreed to whatever rate of interest was demanded. In this case, the rate was 120 per cent. per annum. As an assignment or hypothecation of wages, generally, without regard to some subsisting contract is not valid here, lenders took an assignment of wages to be earned under some particular contract. When disputes arose between borrower and lender as to the date or amount of payments made, or the date or the amount of the loan, or the borrower was slow in meeting his promises, the lender would file with the employer the instrument assigning the wages. The laborer was thus prevented from receiving his wages, although he continued to work, until the dispute was settled. Cut off from his means of subsistence, the borrower was almost invariably forced to succumb to the demands of the lender. Much suffering ensued among laborers, and great harassment

147 F.—35

and injury resulted to employers, who could not determine with any certainty how long their employés or laborers would remain in their service under contracts which had already assigned their earnings as to which disputes were likely to arise at any time. Railroad companies, owners of furnaces and mills, and other large employers of labor, made and enforced rules, for their own protection, that employés who had unsettled disputes about an assignment of their wages should be laid off, and if the dispute were long-continued, should be discharged. Lenders became, in fact, the controllers and dictators of the labor of the borrowers. The differences between lenders and borrowers, and the steps which employers felt compelled to take in consequence, brought on conditions which were yearly reducing hundreds of laborers and other small wage earners to a condition of serfdom in all but name. In the "business of banking," these small loans were seldom, if ever, made to this class of borrowers on the security named in the statute. The profits from these loans attracted another and different class of lenders, who, as the Legislature knew, monopolized the loans of this class of borrowers and engaged in evil practices, in which banks and bankers did not indulge in the rare instances in which they made such loans. Loans by banks and bankers under $75, and loans over that amount, no matter by whom made, were rarely secured by an assignment of future wages or a lien upon household goods, and were not productive of the evil which the statute seeks to cure. The Legislature knew that the taking of the security named by one class of lenders had almost invariably brought forth evil, while the same loans, on the same security, by another class in "the business of banking," had seldom, if ever, been harmful to the public welfare. The lawmakers, in devising a remedy, had to consider the different habits and conduct of men in these occupations as to these loans, in order to apply an intelligent and just preventive, and in doing so, necessarily discriminated between these classes, according to ther well-known habits and customs in the matter. No discrimination is made by the statute between those classes as to the right to contract. All alike are permitted to make these small loans on the security named. No class is licensed or taxed for anything done in connection with them. All classes are left to stand on the same footing in all these respects. The only discrimination is that one class of lenders is required to state, while the others are not, the truth in certain simple particulars as to the actual transaction in the instrument which evidences it and to record that instrument. The statute is a police regulation pure and simple, to check usury and promote fair dealing in loans between one class of money lenders and one class of borrowers on a particular kind of security, by requiring certain statements to be put in their contracts and that they be recorded. If the practice of one class of money lenders makes such precaution necessary as to them, it would be going an unwarranted length to hold that the state police power must either leave them entirely alone or else provide the same regulations, regardless of any need for them, for like loans made by all other classes of money lenders. St. John v. New York, 201 U. S. 637, 26 Sup. Ct. 554, 50 L. Ed.

——. Such a contention has met with almost universal disapprobation in the courts, both state and federal. If the court should strike down the statute for the reason here urged, it would be a bald invasion by the judiciary of the legislative prerogative, in a matter over which the Constitution has left the lawmaker almost boundless discretion, simply because the meshes of the statute have not been woven so fine as to gather in every possible offender in every other branch of the money lending business.

The presumption is that the Legislature acts in good faith. The statute shows beyond peradventure that the lawmaker had a bona fide purpose to cure a wrong and had no design to unjustly discriminate, and has not done so, between the class whose conduct it regulates and those whose conduct it leaves unregulated, as regards these small loans. The Legislature could well regulate the conduct of one class and leave the other unregulated, and discriminate between loans under and those over $75. Commonwealth v. Danziger, 176 Mass. 290, 57 N. E. 461. This statute clearly does not fall within the principle which vitiates legislation forbidding one set of men to take usury and at the same time permitting others to do so. The laws regarding usury are not changed by the local statute, and still bear alike on all classes, whether they fall within or without the regulations of the statute, and it does not give any class any advantage whatever over the other in this respect. The statements exacted in the written contract and that it be registered are not burdensome, and do not deprive the lender of any right or property. They are only reasonable regulations of a right. Save as denied by the express prohibitions or necessary implications of state and federal Constitutions, the Legislature has boundless power over such matters. Dorman v. State, 34 Ala. 216; M. K. & T. Ry. Co. v. May, 194 U. S. 267, 24 Sup. Ct. 638, 48 L. Ed. 971; Fidelity Mutual Life Association v. Mettler, 185 U. S. 308, 22 Sup. Ct. 662, 46 L. Ed. 922; Davis v. State, 68 Ala. 58, 44 Am. Rep. 128; Holden v. Hardy, 169 U. S. 391, 18 Sup. Ct. 383, 42 L. Ed. 780.

2. The effect of the assignment, without regard to its infirmities under the local statute, is avoided by the provisions of the bankruptcy law as to wages earned after the filing of the petition. The power or ability of the debtor to earn wages in the future under a subsisting contract, standing apart from anything which it has brought into existence as property, is the mere right of the debtor to create property in the future. One dominant purpose of the bankruptcy statute is to prevent creditors from seizing, directly or indirectly, upon this right of the bankrupt, after his adjudication, by applying its subsequent fruits to anterior obligations. This right of the bankrupt falls neither under the head of lands, chattels, nor choses in action, and it is not vendible. It is not subject to seizure on execution at law, or equitable attachment, and equity will not appoint a receiver to intercept the expected fruits of its exercise. Specific performance of a contract as to future personal services will not be decreed. In a broad sense, the right of a man to render personal services under an existing contract may be said to be his property; but the nature of the right is such that no one can compel him to exercise it, or get title

to or lien upon it. The law, except as a punishment for crime, can never take this right away from a man, or confer any property in the right itself upon another man. It can affect the right only by dealing with the property it brings into existence. Whether it can then be taken depends upon the man's status at the time, and whether the law then gives a remedy for the enforcement of his contract concerning the thing his labor has brought into existence. The debtor's right to earn wages in the future and to dispose of the fruits of his labor is not "property" in any sense in which the bankruptcy statute uses the term, but constitute rather rights and privileges which go to make up a man's liberty and freedom. The plain purpose of the statute is that the title and right to all things and rights which do not fall within the vesting words of section 70 of the bankruptcy statute (30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]) shall remain in the bankrupt, and that as to the rights or things thus saved to him he shall be released from all liability to answer for prior debts and contracts, with certain exceptions not here material. The right of the debtor to work and contract for future service is not mentioned, directly or inferentially, in the rights or things required to be sold, appraised, or scheduled, or which pass to the trustee for the benefit of creditors. The studied enumeration of the particular rights and things which the bankrupt is required to surrender takes all other rights and things not named without the definition, thus fixed, of the "property" which the statute intends to take from the bankrupt or to pass to his creditors. Whatever he is not required to surrender is his absolutely, freed from the enforcement of the obligation of his prior contracts, unless at the time of the filing of the petition it has taken the form of property, upon which a lien has fastened. In that event only does he take it subject to the performance of prior contracts concerning it. If a debtor should solemnly contract for a present valuable consideration not to avail himself of the benefit of a discharge against the enforcement of a contract as to wages to be earned when they do actually come into existence, his undertaking would be void on grounds of public policy. Nelson v. Stewart, 54 Ala. 115, 25 Am. Rep. 660. Equity, therefore, cannot import into the obligation of the assignment any promise of the assignor, upon which to build an equity to a lien, that the power will be exercised after the adjudication, to bring wages into existence to satisfy the terms of a prior assignment, or that the bankrupt will not avail himself of a release from the obligation, when it is sought to enforce it after his discharge. The adjudication of a debtor, followed by a discharge, takes away all remedy for the enforcement of the obligation of the contract concerning wages earned after his bankruptcy, precisely as the discharge releases the debtor from the performance of the obligation of his promissory note made prior to the adjudication. Clark v. Clark, 17 How. 315, 15 L. Ed. 77; In re West, 11 Am. Bankr. Rep. 782, 128 Fed. 205. As well said by Judge Bellinger, In re West, supra.

"The discharge in bankruptcy operated a discharge of these obligations as of the date of the adjudication, so that the obligations were discharged before the wages intended as security were in existence. The law does

not continue an obligation in order that there may be a lien, but does so because there is one. The effect of the discharge upon the prospective lien was the same as though the debt had been paid before the wages were earned."

Mallin v. Wenham, 209 Ill. 252, 70 N. E. 564, 65 L. R. A. 602, 101 Am. St. Rep. 233, reaches a contrary conclusion. Clearly it disregards the plain policy of the statute. It is not supported by the weight of authority. The theory of that decision is that, as the assignee has a right under his contract to take the wages when they do come into existence, the right so to take them, though the wages are not then in existence, amounts to an equitable lien, at the time of the adjudication, which the bankruptcy statute preserves against the absolutions of the discharge. But what was then in existence upon which a lien could fasten? Certainly nothing but the right to work under the contract in the future. That right cannot be the subject of any lien whatever, either at law or in equity. Caption of the fruit of that work after bankruptcy cannot be sustained on the theory that the assignee had a prior lien on the right to work, which can be extended to the fruits of that labor. The wages not being in existence at the time of the adjudication, and the right to earn them not then being subject to a lien, there was no property or thing in existence, at that time, upon which a lien could attach, or be preserved. The most the assignee had, at the time of the adjudication, was an executory contract to turn the wages over to him when they did come into existence in the future. East Lewisburg v. Marsh, 91 Pa. 96; Christian & Craft Grocery Co. v. Michael & Lyons, 121 Ala. 87, 25 South 571, 77 Am. St. Rep. 30. This equity cannot be made to ripen into a lien upon the wages until they come into existence after the adjudication, and then only by enforcing against the bankrupt the obligations of a contract for whose enforcement the law denies all remedy, and from which the discharge releases the bankrupt of all liability. The upholding and enforcement of the claim of the creditor, under such circumcumstances, is not the preservation of a valid lien, which the bankruptcy statute saves, but the creation outright of a lien in violation of the provisions of that statute.

Mitchell v. Winslow, 2 Story, 630, Fed. Cas. No. 9,673, upon which Mallin v. Wenham is really rested, does not sustain it. In the former case the owner of a manufacturing plant mortgaged it, together with such tools and stock as might be acquired in the next four years, during which the debt was to be paid. Upon default the mortgagee took possession of the mortgaged property and the tools and stock in trade acquired in the business since the making of the mortgage, and the contest as to the title to the acquisitions of the mortgaged property was between the purchaser from the mortgagee and the assignee for creditors. The bankruptcy statute of 1841 provided, among other things, that nothing therein shall be construed "to annul, destroy, or impair any lien or mortgage or other securities on property, real or personal, which may be valid liens by the laws of the states, respectively, and which are not inconsistent with the second and fifth sections of the act." The present bankruptcy statute preserves valid

liens upon property in actual existence at the time of the adjudication, but does not save the right to create liens in the future on something to come into existence in the future, by enforcing executory contracts made concerning it, when the subject-matter has not come into existence at the time of the adjudication, where a discharge destroys all remedy for the enforcement of the bankrupt's liability under such contract. Justice Story was speaking of an accretion or increase in the form of "personal property," to quote the expression of the statute of 1841, as to the subject-matter upon which it saved liens, which had come into existence and passed into the possession of the creditor before adjudication, and not of a subject-matter, like wages to be earned, the mere fruit of the bankrupt's personal exertions, when they are earned and it is sought to seize them after adjudication. He was dealing with no such right, and was not giving the law as to the proper construction of a bankruptcy statute like the present as to such right. Moreover, under Mallin v. Wenham, the bankrupt must quit his former employer during the period covered by his assignment, else the obligation of his contract as to wages is enforced against him. The discharge destroys the remedy for the enforcement of the obligation of the contract, and it cannot be revived except upon a new promise. Continuing to work for the former employer does not constitute a new promise to pay the debt, and does not revive the remedy or avoid the release of the discharge. In many callings and occupations, which will readily suggest themselves, there is frequently only one employer in a village, town, or locality. Forcing the bankrupt to pay, or move away to get work in his usual vocation, interferes with the bankrupt's liberty, and deprives him of some of the most valuable rights the discharge vests in him. Very plainly that decision thrusts into the statute an exception which the statute does not make as to the liabilities from which a discharge shall not release the bankrupt.

The English courts have repeatedly held under their statutes, which are fully as broad as ours, regarding the preservation of liens and as to what passes to creditors, that the earnings of the bankrupt after the making of the vesting order, and before the order of discharge, cannot be recovered by the assignee, but pass to the bankrupt. The reason is tersely stated by Lord Denman, when he says, "The bankrupt must live." In Williams v. Chambers, 69 E. C. L. 337, Lord Denman said:

"It is claimed upon the pleading, as a debt directly due the assignee for personal labor of the insolvent. If the plaintiff were entitled to recover in respect of such a claim, we must go the length of deciding that the assignee, in the words of Lord Mansfield, in Chippendale v. Tomlinson, 1 Co. Bank. L. 432, let the insolvent out to hire and contract himself for his personal services."

Many years ago the Supreme Court of Alabama, in Mosby v. Steele & Metcalf, 7 Ala. 301, declared:

"It is entirely reasonable, in the interval which must elapse between the decree and the final hearing for the bankrupt's discharge, that he shall be permitted to hold property subsequently acquired, as otherwise he would not be able to support himself and family."

Accordingly, holding that under the bankruptcy act of 1841 the federal courts had no power to interfere with the proceedings of the state courts, it enjoined the sheriff, who had made a levy, from selling under execution goods of the insolvent, acquired subsequently to the filing of the petition, and ruled, if a discharge were granted, that the injunction be made perpetual.

Lastly, the Supreme Court of the United States has declared that the "liberation" of the bankrupt "from incumbrance on future exertion" is one of the main objects of the statute. Hanover Nat. Bank v. Moyses, 186 U. S. 192, 22 Sup. Ct. 857, 46 L. Ed. 1113. We do not doubt, therefore, that the right and title to the wages earned by Rose after the filing of the petition passed to the bankrupt, released from any claim or right growing out of the assignment.

3. There is no aspect of the case in which the company can complain of the order to withdraw the notice of the assignment of wages, and no foundation in law for its insistence that the court could not compel it to do so in a summary proceeding. The contract of loan, under which the assignment was taken, being in violation of public policy, the assignment could not give any possession of the wages, either actual or constructive, or any title whatever. In the nature of things the respondent could not have any actual possession of the unearned wages, for they had not come into being. Prior to the adjudication the company took no steps which could reduce the wages to its constructive possession, even if it be conceded that its contract authorized it to take possession when the wages did come into existence. It did not notify the employer, and the latter made no promise. It had done nothing but take the assignment, which was a legal nullity. Whatever of actual possession there was of the wages, as between the lender and the employer and the bankrupt, when the latter filed his petition, was certainly not in the lender. The employer laid no claim to the wages, and was a mere stakeholder. This was the state of affairs existing at the time of the adjudication. The filing of the petition, to say nothing of the adjudication, operated as an attachment and injunction, as of the date of the filing of the petition, and put the wages already earned in the custody of the court. and fixed the status and rights as to the unearned wages. International Bank v. Sherman, 101 U. S. 407, 25 L. Ed. 866. Even if the assignment had been valid, no step taken by the lender subsequent to the adjudication could have been effective to vest him with possession. All the steps the lender subsequently took were invasive of a possession which was already in the court; and in that posture of the case the court could summarily compel the lender to restore that status quo as to these wages, by withdrawing notice of the assignment, even if the assignment had been valid, and to prosecute its claim, if it insisted on it, in the court of bankruptcy. The Home Discount Company not only interfered with the wages, after they were in the custody of the court, but the only contract or instrument under which it claimed title or right to interfere was, as matter of law upon the undisputed facts, an absolute nullity. It was, therefore, a mere naked intermeddler. The authorities are unbroken, under such circumstances, that the court may interfere sum-

marily to compel the intermeddler to desist and restore the status quo.
Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405; White
v. Schloerb, 178 U. S. 542, 20 Sup. Ct. 1007, 44 L. Ed. 1183; In re
Tune (D. C.) 115 Fed. 906. Apart from the wages being already
in the possession of the court, in consequence of the adjudication, the
law, under the circumstances, gave the bankrupt the right to enjoy,
pending discharge, certain privileges, immunities, and benefits, in the
free exercise of which the statute imposes the duty upon the court
to protect him. Among them is the right to enjoy the benefit of a dis-
charge, if the bankrupt complies with the provisions of the statute,
and, in order that the practical good of such discharge shall not be
taken from him, that he shall not be coerced, pending discharge, by any
device of creditors, into the payment of a debt from which the dis-
charge would free him, or which would operate upon his rights to any
particular property, if the effect of such discharge would pass such
property either to himself or to the estate, as against a creditor who
claimed it for himself. The jurisdiction of the court to protect the
bankrupt in the enjoyment of such rights, whether ancillary or origi-
nal, is abundant and its exercise is justified to conserve to the fullest
extent the court's original jurisdiction, which had already attached
in the particular case. Before the assignment was filed, the bankrupt,
his estate, and privileges which he was entitled to enjoy in conse-
quence of the adjudication, had been drawn into the cognizance of
the court of bankruptcy. It was under duty, and had undoubted au-
thority, to prevent any intermeddling with the administration of the
estate, already begun in the court, and to prevent the taking of any
steps which would defeat the application of the assets according to law
or frustrate the bankrupt's right to the practical enjoyment of the privi-
leges the statute confers upon him, in event of discharge. The filing
of the assignment of the wages with the bankrupt's employer the day
after the adjudication was an effort to embarrass the administration of
the estate, and to force the bankrupt by the sore pressure caused by
withholding the wages to pay an illegal demand, from which a dis-
charge would free him. It was nothing more than an effort to starve
him into abandonment of his right under the law, in defiance of the
orders made to enforce those rights. If a court of bankruptcy has
no power to prevent creditors from making such use of assignments
of wages, it had as well shut its doors, and abandon all effort to vin-
dicate the rights which the statutes commit to its protection. The
law does not make such weaklings of courts of bankruptcy. They
have ample power to protect the bankrupt in the enjoyment of all
his rights, and to frustrate the efforts of those who seek to defeat the
practical enjoyment of them. In re Hicks (D. C.) 133 Fed. 739; sec-
tion 2, subd. 15, of the bankruptcy statute (Act July 1, 1898, c. 541,
30 Stat. 546 [U. S. Comp. St. 1901, p. 3421]); Collier on Bankruptcy
(5th Ed.) p. 26.

4. The referee's order was not erroneous in any degree, because
the proceeding, which resulted in the order, was begun at the instance
of the bankrupt. The court administers the property. It is its duty
to see that the assets are administered according to law. The trans-

action upon which respondent relied being violative of public policy, respondent had no right, title, or real claim to the wages, and in attempting to apply, and afterwards applying, them to its void claim, it was, we repeat, a mere naked intermeddler. The court could rightly interfere, of its own motion or upon complaint of the bankrupt or any other interested person. In re Tune (D. C.) 115 Fed. 906. It is the statutory duty of the bankrupt to inform the trustee of violations of the act. The court is not bound to delay proceedings when the matter is brought to its attention, and insist upon the circumlocution of having the bankrupt go first to the trustee, and then having the trustee come to the court. Moreover, the assignment filed with the employer covered not only wages earned at the time of the bankruptcy, but those to be earned. The earned wages, not having been claimed as exempt and the assignment of them being void, were assets of the bankrupt's estate. The wages earned after the filing of the petition, as we have seen, in event of discharge, passed to the bankrupt in his own right. The assignment purported to cover both, and keeping it on file, although it was a nullity, had the practical and inevitable effect to prevent the employer from paying the earned wages into court, as he should have done, and detained the wages earned after the adjudication from the possession of their lawful owner. The bankrupt had a direct personal interest in moving for the order.

5. There is no legal basis whatever for the theory that the court has no power to interfere here, because the loan was obtained by a false pretense by the bankrupt, whereby a debt was created which could not be affected by a discharge. The agreement under which the loan was effected and the assignment taken, being the offspring of a transaction offensive to public policy, are utterly powerless to create a debt, or to confer any rights upon the lender, which a court can recognize. The borrower and the lender are in no sense in pari delicto, and the borrower, therefore, may have relief against the transaction which the lender could not. Smith v. Bromely, 2 Douglass, 670; Browning v. Morris, 2 Cowper, 793; Turner v. Merchants' Bank, 126 Ala. 415, 28 South. 469. This would be true, even if the marshaling of the assets, according to the provisions of the statute, could be said to be administering equitable relief to the bankrupt against the contract. The local statute puts no duty upon the borrower, and does not restrain him from doing anything. It was enacted to protect the borrower against the lender. Moreover, if it be conceded, in view of the prohibitions of the statute, which the lender plainly violated, that the bankrupt could by false pretense create a debt which the court could recognize, and which could not be affected by a discharge, the fact remains that the bankrupt denied the making of the false pretense, and the referee who saw and heard the witnesses, decided the issues of fact in favor of the bankrupt. In view of the circumstances of the case, the court thinks the bankrupt's version most probably the true one, and, if it doubted, could not disregard the finding of the referee on this point, unless reasonably convinced that it was erroneous.

6. The insistence that the court has no right to make any rule for securing the costs on the petitions for review of the referee's order,

and that it-is powerless to exact bond or other indemnity for the protection of the opposite party during the stay of the order, pending the review, is wholly unfounded. In the absence of statutory provisions or rules of court, a petition to review or revise an order of the referee does not in and of itself operate a supersedeas of the order, and whether or not it shall have that effect, rests in the discretion of the reviewing or reviewed authority in the particular case. It has few of the properties of an appeal. Primarily, at least, it does not contemplate a trial de novo. It removes nothing out of the District Court into any other court. The petition, though filed with the referee, is really addressed to the District Court, and asks action by that court on a record which remains in that court. It is no more than a petition for a rehearing, or a motion for a new trial, in the court of original jurisdiction, while the judgment or decree remains in the power of the court during the term, and does not stay execution, unless in pursuance of rules or by special order. Aside from the inherent power of courts to provide rules for administering of justice therein, the court has abundant statutory authority to make all reasonable regulations, not inconsistent with those prescribed by law and the rules made by the Supreme Court, which it deems needful to prevent abuses of frivolous petitions for review. One of the rules in force, when the referee's order was made, provided "that on hearings before referees in bankruptcy, and on nisi proceedings when the rule is made final, the filing of a petition for review shall not act as a supersedeas, unless the unsuccessful party shall file bond, with surety, in such amount as may be required by the referee or judge, conditioned to pay any damages growing out of said appeal, in event the same is not successfully prosecuted. Failure to comply with the order of the referee, unless petition for review and bond be filed and allowed by the referee, may be treated as a contempt of court." The only regulation in the statute regarding the revision of orders of referees is that they are "subject always to review by the judge." No. 27 of the General Orders in Bankruptcy prescribes only the form in which the matter for review shall be presented to the judge, and does not deal with any question of costs or the effect of the filing of the petition as a supersedeas. Nearly every order the District Court makes is subject to revision on appeal or writ of error. Yet it has never been heard that the party aggrieved can have a supersedeas, or avoid giving security for costs, in disregard of the rules of the court, merely because the law gives a writ of error or appeal as a matter of right. There is nothing in the regulations made by the District Court which runs counter to the statute or rules of the Supreme Court. With the volume of business in the Middle and Northern Districts presided over by a single judge, whose time is constantly engaged with the common law, criminal, and equity dockets, as well as the bankruptcy business, in five different places of holding court, from four of which the judge is always absent, it would be an intolerable abuse if a suitor, no matter how frivolous his objections, could, by the simple expedient of filing a petition for review, stay the execution of every order until finally confirmed by the District Court, and then, if the petition be determined ad-

versely to him, escape all liability for damage done by the delay to the adverse party. In cases like this, which are constantly arising, such a doctrine would starve nearly every bankrupt into submission to demands of creditors. It would convert orders of referees into mere recommendations, to which no one need pay any heed until they are confirmed by the District Court, and would vest in the irrevisable discretion of disappointed suitors a power and discretion which the law lodges only in the court.

7. This is not one of the cases in which reliance upon the advice of counsel can shield a party from the consequences of a deliberate disobedience. Here there was a purpose not to perform an act which the order exacted—an order so precise and definite that no man could read it and fail to know what it demanded. Respondent does not claim that it misconstrued the order, or that it did not intend to disobey it. On the contrary, it admits that it knew precisely what the order required and that it did not intend to obey it. It concluded to disobey on the advice of counsel, on the theory that the referee had no authority to make the order and that the court had no power to compel obedience to it before the court itself first passed on the petition for review. Having ability to comply, and having intentionally and designedly disobeyed the order, realizing fully what it enjoined, the company cannot be heard to say that it did not intend disobedience to the process of the court. The intent is shown by the act, which speaks for itself. Agnew v. United States, 165 U. S. 50, 17 Sup. Ct. 235, 41 L. Ed. 624. This is not a case where the disobedient party did a forbidden act, honestly, though mistakenly, believing that its conduct was not forbidden by the order, and therefore, although it knowingly did the forbidden thing, yet had not any actual intent to disobey the command. Under such circumstances there is no moral intent to defy the order, though there is disobedience to its command. The principle has no application here, where a party knowingly and intentionally refused to perform a specific act, which he knew the order commanded him to do. The law prescribes the extent of the duty of obedience to a judgment or decree. If the order be void, any person may disregard it with impunity. If it be not void, though it abound in error, it must be respected, until reversed or suspended in some appropriate proceeding. The advice of counsel cannot make an order void, if it be not void; and it cannot lessen its requirements, or relieve a party from the duty of conforming to them. The rights of the disobedient party are exactly the same, whether he acts with or without the advice of counsel. Whosoever intentionally defies an order, whether upon his own judgment, or in reliance upon the advice of counsel, takes upon himself the peril of making a right decision, and if he make a wrong decision he must bear the consequences. It will seldom happen, if sufficiently diligent search be made, that some attorney cannot be found who will advise a discontented suitor, and honestly too, that a distasteful order is wholly without warrant of law, and therefore may be safely disobeyed. To recognize the advice of counsel as a justification or an excuse for a willful defiance of a valid order of the court would go a long ways towards sanctioning anarchy. The process of the court would be

robbed of the sanction which the law gives it, and depend, instead, upon the varying views of counsel in each particular case, no matter how erroneous they might be. Such a doctrine finds no countenance in our jurisprudence.

8. After the referee made his order the respondent took no step either to obey it or to supersede it. Notwithstanding the rule nisi from this court to its managing agent about three weeks after the referee's order, respondent continued to tie up the wages of the bankrupt until in the end it was enabled to coerce him to make a settlement out of court, the effect of which, in defiance of the provisions of the bankruptcy statute and the orders of the court was to make valid a void assignment and kill all enjoyment by the bankrupt of rights which the laws secure to him in the interval between his adjudication and discharge. This private settlement, which it was enabled to effect only by its persistent disobedience, was never brought to the attention of the court until it called for explanation; and then it is boldly brought forward, not only as a determination of all matters at issue between the respondent and the bankrupt, but as foreclosing all right of the court to take notice of the issues respondent raised with the court by its persistent defiance of its process. Respondent urges that this settlement was voluntary on the part of the bankrupt, and made at his instance, and that as an inducement to it he promised to dismiss the contempt proceedings, in order to obtain what respondent seems to consider a personal favor to the bankrupt. The settlement, though, perhaps, not made under such duress as would enable the bankrupt to avoid it was far from a favor to him. The respondent had tied up the wages of the bankrupt for weeks. For what purpose? Did not the bankrupt yield to the company's exactions in order to obtain a part of his wages, rather than to face the worse situation which confronted him if he held out? The settlement was a favor to the bankrupt only in the sense that a captor's acceptance of an offer of a ransom is a boon to his helpless captive, because it relieves him from greater evils. The bankrupt could not bargain away any right of the court. He could condone violations of the orders of the court only in so far as they affected his civil and pecuniary rights. The disobedience here involved much more than disregard of the personal rights of the bankrupt, because that result was accomplished and could be accomplished only by persistent and flagrant defiance of the authority of the court. The court is compelled to notice respondent's conduct, because, in the language of Blackstone, it demonstrates "that gross want of regard and respect, which when courts are once deprived of, their authority, so necessary for the good of the kingdom, is entirely lost among the people." Bessette v. W. B. Conkey Co., 194 U. S. 329, 330, 24 Sup. Ct. 665, 48 L. Ed. 997. Respondent was charged with knowledge, and doubtless actually knew, since it was advising with counsel, that the nature of the step of the court should or might take to rebuke and punish the defiance of its orders could not be a matter of barter and sale with the bankrupt. When analyzed, the excuse here set up, notwithstanding the formal protestations of respect for the authority of the court and want of any intent to contemn its process, is nothing

more nor less than the assertion that the respondent had a right to do what it did, and that, having forced the bankrupt to settle the controversy in defiance of the orders of the court, it is now none of its business how that result was brought about. Such conduct "is utterly inadmissible in any community professing to be governed by law." In re Swan, 150 U. S. 652, 14 Sup. Ct. 225, 37 L. Ed. 1207. All respect would be lost for the orders of a tribunal which would receive the excuse here tendered, or allow it to go unrebuked and unpunished.

The abuses resulting from these loans, taken in violation of the local statute, and the methods resorted to for their enforcement, the bankruptcy law and all other law to the contrary notwithstanding, have grown so great that the number of insolvents who flee to the court of bankruptcy for refuge is larger in the Northern District of Alabama than in any other district of the United States, with two or three exceptions. It is high time that an end was put to this state of things, if a firm enforcement of the law can bring it about. The Home Discount Company is the real offender. Its disobedience was willful. It persisted in its lawless conduct to promote its own gain and to effect its own unlawful ends. The court, under the circumstances, will not consider how far it ought to deal with the mere agent, a woman who was misled by the advice of counsel, and perhaps thought she was only doing her duty to her employer, but will visit the penalty upon the real author of the disobedience. While the advice of counsel cannot be received as a justification or excuse for resistance to a valid order, the court may in its discretion consider it in mitigating the penalty for disobedience, and it does so now in imposing a fine of $500.